Chryst v. Chryst

C.P. of Berks County, no. 09-7246.
*Robert L. Sharpe Jr.*, for plaintiff.
*Joel H. Merow*, for defendant.

## DECISION AND ORDER

LASH, *J.*, October 25, 2010—This court held a child custody trial on September 21, 2010, October 1, 2010, and October 8, 2010. Both parties seek primary custody of their minor child. The court enters the following Findings of Fact:

## I. FINDINGS OF FACT

1.  Plaintiff, Thomas E. Chryst (hereinafter "father"), is an adult individual who resides at 5911 Shepherd Hills Avenue, Lower Macungie Township, Lehigh County,

Pennsylvania.

2.  Defendant, Brenda Chryst (hereinafter "mother"), is an adult individual who resides at 202 Cinder Street, Birdsboro, Berks County, Pennsylvania, 19508 since July 2010. Previously, she resided at 207 Caramist Circle, Sinking Spring, Berks County, Pennsylvania.

3.  The parties are the natural parents of a minor child, Fortress M. Arielle Chryst, born May 14, 2008, (hereinafter "minor child").

4.  Father resides in the East Penn School District and mother resides in the Daniel Boone School District.

5.  The parties were married on November 5, 2005, separated in December 2006, and were divorced on June 6, 2008.

6.  Since her birth, the minor child has resided primary with mother.

7.  Father filed the within action, seeking primary custody. A temporary order was entered on September 2, 2009, on motion of the Custody Master, providing, among other things, that the parties would share legal custody, with mother having primary physical custody and father having partial custody the first three (3) weekends each month from Friday at 3:00 p.m. until Sunday at 12:00 noon.

8.  Father is employed at Air Products & Chemicals, Inc., as a senior tax manager. He works full time, but has a work schedule that is completely flexible and provides him with the ability to work from home at his discretion.

9.  If father obtained primary physical custody, he

would contract with Academy of Little Learners, a daycare center in existence for approximately twenty-five (25) years, located approximately 1½ miles from his residence. The minor child would spend half a day at the daycare for educational and social developmental purposes.

10. Mother is employed full time through the Commonwealth of Pennsylvania as a secretary to the Honorable James Stapleton, W.C.J. Generally, her work hours are Monday through Friday from approximately 8:30 a.m. until 4:30 p.m. Recently, she has changed her hours, now working Monday through Friday from 10:30 a.m. to 6:00 p.m., with these hours to continue for the foreseeable future. Mother also has some flexibility in her work schedule.

11. Mother has enrolled the minor child at a daycare through Kindercare in Wyomissing, Berks County, Pennsylvania.

12. Father currently resides alone in a ranch home in a suburban area, with his property abutting a golf course. The house is suitable for care of a young minor child.

13. Father was married previously to Colleen Mullins Chryst. They were separated in November 2003, becoming divorced in September 2005. Father has two (2) adult children from this marriage, Abby Chryst, born October 13, 1983, and Allison Chryst, born August 29, 1985.

14. Father and his former wife, Colleen Mullins Chryst, maintain a good relationship, even to the extent that his former wife provides father with home cooked meals approximately once a week.

15. Mother resides with the minor child, as well as

her adult daughter from another relationship, Preness M. Graham, born September 7, 1989.

16. Mother's household is suitable for rearing the minor child.

17. The parties reside approximately 50 minutes apart.

18. Mother was convicted of summary offenses of harassment and disorderly conduct, stemming from an incident at father's home, where she appeared at the home at night without warning, was knocking and kicking at the door and tossing patio furniture. Additionally, a Protection From Abuse Order was entered on father's behalf against mother by the Lehigh County Court of common pleas.

19. An independent psychological evaluation was performed by Ivan L. Torres, Ed.D., of Alpha Counseling and Mediation Center, Inc. Dr. Torres interviewed the parties, mother's adult child, Preness, father's ex-wife, Ms. Mullins Chryst, his child, Allison Chryst, reviewed documentation, and conducted a home evaluation. He provided a written report dated March 30, 2010 and testified at trial.

20. Mother has been diagnosed with major depressive disorder and has been treating for same since 2009.

## II. DISCUSSION

In making disposition, this court considered the testimony of the parties, father's ex-wife, Colleen Mullins Chryst, father's adult daughter, Allison Chryst, mother's adult daughter, Preness M. Graham, father's friend, Barbara Whitaker, the testimony and evaluation of Dr.

Torres, and the Exhibits filed by the parties.

Father testified that it would be best for the minor child if she resided with him. He presents himself as a man of order and structure, who could provide a safe and stable living environment. He owns a nice home adjacent to a golf course, which is safe for a toddler, as it is primarily one (1) level, with only one (1) set of stairs. There is little traffic in the neighborhood. Father also has an excellent support system in his ex-wife and two (2) daughters from his first marriage. He has looked into the use of a daycare near his home, which will be appropriate for the minor child. He would use the daycare for a half day to help with educational and social development.

Father's hours are flexible, and as he is able to work from home, he would be available to care for the minor child. Additionally, he plans to retire in approximately a year and a half and could then be a full time father, which he states is his true passion.

Father also states that he is aware of the importance of appropriate co-parenting and insists that he will do his part to make sure that the parties work together in harmony for the benefit of the minor child. He states that his outlook contrasts with mother's, who has made it difficult for him in several areas. She has denied him visits and has refused to answer the phone when he calls to speak to the minor child. She has falsely accused him of improprieties, resulting in him being reported to Children & Youth Services on several occasions, with all of the investigations concluding with an "unfounded" report. Mother has also denied father the opportunity to take the minor child on outings, such as to the beach or to a family reunion. Her

excuse is that the minor child is "too rambunctious."

Mother has been known to be hot tempered and engage in abusive and threatening language toward father. She has assaulted father on several occasions. On one occasion, mother appeared at father's house unannounced, banging on the door and turning over patio furniture. The police were called, and eventually, mother was charged with summary offenses and also had a Protection From Abuse Order entered against her.

Father also contends that mother has sent correspondence and e-mails to his ex-wife and other family members of his, disparaging him, making false allegations about his conduct, in an attempt to portray him in a bad light with his family. According to mother, the allegations are true and her purpose is to provide father with his "comeuppance."

Father believes that mother continues to struggle with mental health issues, resulting from her being sexually abused as a teenager. He sees her now as "hypersensitive," being extremely overprotective of the minor child, creating unnecessary problems for father. She has stated that the minor child should not be in the presence of any men, for men in general, and some women, will molest children.

Father also believes that mother, who herself has poor dietary habits, is inappropriate in her feeding habits of the minor child, causing the minor child to be grossly overweight. Father also contends that mother, who by her own admission sometimes gets home as late as 7:00 p.m. or 8:00 p.m., bathes and feeds the minor child at a late hour, causing the minor child to be drowsy during the day at the daycare. Father also asserts that mother engages in

hypochondriac behavior regarding the minor child, taking her to the doctor on numerous occasions unnecessarily.

Mother believes that the temporary order currently issued, providing her with primary custody of the minor child, should remain in place. Mother has had primary custody of the minor child since her birth. She has attended to all of the minor child's needs on a daily basis. She has an extremely close bond to the minor child. She properly supervises the minor child's medical needs, as the minor child has asthma, requiring vigilance, particularly during certain times of the year. She interacts with the minor child recreationally as well, taking her on various outings. She makes a point of spending time with the minor child every night at bedtime, reading to her, and remaining with her in the minor child's bedroom until the minor child falls asleep. Mother's other daughter, Preness, also has an excellent relationship with the minor child and assists mother in the caretaking and recreational activities. The two have a close bond.

Mother contests father's commitment to the minor child. For example, she notes that the minor child was hospitalized on several occasions and was not visited by father. On one (1) occasion, when mother and the minor child stayed over at father's house, the minor child had difficulty breathing during the course of the night. Mother responded immediately and stayed with the minor child. Father, on the other hand, did nothing, and according to mother, became annoyed with mother. Father also smokes, sometimes even in the house, which exacerbates the minor child's asthmatic condition. Mother believes that father's purpose in filing the within custody action is to eliminate or reduce his child support obligation.

Father uses some of his scheduled partial custody time for his own purposes such as attending golf outings, with the minor child being watched by father's daughter. Further, the minor child has been injured on more than one (1) occasion while at father's home, causing mother to draw the inference that father is not properly supervising the minor child. Mother even questions whether father has the capacity to properly feed the minor child, as some of father's meals are cooked for him by his ex-wife.

Mother has concerns about father's behavior and attitudes toward her which could impact on the welfare of the minor child. Mother, who is African-American, alleges that father, who is Caucasian, has used racial slurs. Additionally, he has insulted her and treated her in a derogatory manner, criticizing her for certain things she has done such as her poor housekeeping.

Mother's child, Preness, also complains about father. She believes that he treated her poorly for the entire time she and mother resided with father, for a period of about eight (8) months. She concurs with mother's statement that father issued racial slurs. Preness claims that father acts hypocritically, portraying herself as virtuous and religious on the one hand, and viewing pornography on the other hand. She states that father watched her through a window while she was changing her clothes. Preness claims that father has inappropriately discussed with her certain sexual acts performed by mother.

Mother also has an issue with father's friend, Barbara Whitaker. Ms. Whitaker was father's paramour immediately previous to his relationship with mother, and the relationships actually overlapped. When father

began dating mother, father would speak to mother about Ms. Whitaker and send e-mails he received from Ms. Whitaker, which he claims he sent at mother's request. These conversations and e-mails cast Ms. Whitaker in a bad light, portraying her as a racist and as a person who engages in cultic activities such as witchcraft and speaking to the dead. Accordingly, mother does not want Ms. Whitaker around the minor child.

Mother concedes that she has responded to father's indiscretions with her own improper, and sometimes volatile, behavior. She has made threats to him over the phone. She has described herself to father as a "mad black woman" and a "psycho bitch" and admits stating to others that she hopes that a calamity would befall father. She has assaulted him on at least three (3) occasions. On one (1) occasion, the two (2) wrestled and slapped each other. On another occasion, mother slapped father with a purse, and on the third occasion, mother jumped on father's back. Finally, there was the incident at father's house which resulted in summary offenses and a Protection From Abuse Order being lodged against mother. These incidents generally stemmed from mother's perceived mistreatment of Preness by father or from his continuing contact with Barbara Whitaker.

Mother testified that she is being treated for major depressive disorder, continuing her treatments since 2009. She has been prescribed antidepressant medications, and admits that she sometimes has reduced her dosages, against her physician's advice, for financial reasons. She also complains about insomnia and anxiety, which she testified stems from father's treatment of her, as well as stress from the within court proceedings and the sudden

death of her father.

In his written report, Dr. Torres recited the factual background provided to him from the parties and the others he interviewed. He then compiled a summary and recommendation. Regarding father, Dr. Torres states that he is intelligent and accomplished, being a good provider, and offering a great "degree of stability." He appears committed to having a more active role in the life of the minor child. However, father is noted to have issues with control and obsession. Regarding mother, she is described as being bright, with strong character and independence. She cares deeply for the minor child and her other daughter. There is a strong bond between her and the minor child. However, Dr. Torres notes several risk factors, including her family background. Mother's father was an alcoholic and her family suffered from domestic violence. Mother was also exposed to a statutory rape and an attempted gang rape, as well as chronic sexual abuse at the hands of her maternal grandfather beginning at age 16. These matters were never satisfactorily addressed. Dr. Torres also notes some resulting cognitive, affective, and social deficits, manifested in several ways, including her choice of partners and her "vigilance" in her protection of the minor child. Dr. Torres also noted that mother is not a good housekeeper.

Dr. Torres recommends that the parties share physical custody of the minor child on an equal basis. He also believes that mother and her daughter, Preness, who was also abused, should enter a treatment program for survivors of sexual abuse. He also maintains that father's ex-wife, his daughter, Allison, and mother's daughter, Preness, should be active in the minor child's care.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello*, 446 Pa.Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton*, 442 Pa.Super. 381, 385, 659 A.2d 1040, 1042 (1995).

These parties have exhibited some positive characteristics. Both are intelligent, industrious, and for the most part, law abiding, mother's brush with the law notwithstanding. Both have a good bond with the minor child, with mother's being exceptional. Both care deeply for the minor child and want the best for her and are quite capable of managing the minor child's daily needs. Both have adequate support systems. Both have appropriate household accommodations for rearing a minor child.

While some of the criticisms leveled by a party against the other are overblown, both have significant issues which, if not resolved, could impact on the welfare of the minor child. For one, there is ample evidence that father does try to control his surroundings and the people interacting with him. It appears this behavior was a catalyst in the failure of both of his marriages. Secondly, father appears quite willing to instigate controversy, in essence, "pressing mother's buttons" to antagonize her. There is no reason for him to forward e-mails regarding Barbara Whitaker to mother. This has created difficulties, including mother's outbursts, and serves no legitimate purpose. It is unlikely that

mother will ever have any ability to trust Ms. Whitaker.

At times, father presented in a vague and sometimes disingenuous manner, attempting to portray himself in a favorable light. His testimony, particularly in cross-examination, compromised his credibility. For example, father, on direct examination, was quite capable of presenting precise testimony on occurrences in the past, even to the extent that he could give exact dates. However, he was unable to remember an incident of great significance that his adult daughter, Allison, testified occurred approximately nine (9) or ten (10) years ago when he attacked her with a belt or a hanger for obtaining a tattoo without his permission. At the time, she was 17 years old. This court simply does not believe that he has no recollection of this incident. Because of his insistence on filtering information to this court, as well as mother's candor, this court gives consideration to some of mother's allegations.

That being said, some of mother's allegations are exaggerated, stemming from her paranoia regarding father and men in general. It is apparent that mother's perspective is at times unhealthy, being overly fearful that something bad is going to happen to her daughter. Of course, parents need to protect children from predators. On the other hand, to err on the side of caution by assuming that any man in contact with the minor child is a potential deviant with evil design constricts mother's capacity to parent and the minor child's ability to grow. Her outbursts, which as stated, are a reaction to father's machinations are also fueled in part by her paranoia. Additionally, mother is capable of being vindictive, as evidenced by her forwarding correspondence to father's family, as well as

other comments she made.

It is important for this minor child to have a strong relationship with both parents. Both have the potential to be good parents if they can overcome their psychological problems. Dr. Torres went so far as to recommend shared custody to provide equal access to both households. This court notes that the parties are sometimes able to get along, even post separation. For the parties to reinstate an amicable relationship, they will each have to recognize the other's role as a parent, allow the other parent to live his or her life without interference from the other, and act in an edifying manner, building each other up, rather than attempting to tear each other down.

The minor child is thriving in mother's care, enjoying an extremely close bond with mother. Mother has always been very attentive and doting. This minor child clearly benefits from having mother as the primary custodian. While mother needs to continue with her treatment for depression, and also work on her paranoia and emotional outbursts, the existence of these concerns do not disqualify her from being the primary custodial parent, particularly since father has also exhibited significant dysfunction, and, contrary to his testimony that he wants to work with mother, has instigated and exacerbated emotional tension that would otherwise not have surfaced.

This court believes, however, that it would be appropriate to increase father's time to provide him additional access to the minor child, for reasons set forth. Of course, this may have to be adjusted when the minor child reaches school age, if the parties continue to reside nearly an hour apart.

Unfortunately, it appears that so long as Barbara Whitaker is allowed to interact with the minor child, mother will be unable to remain at peace. While mother's concerns may be overblown, based on her paranoia, father initiated the problem by his willingness to play one woman off the other. It was he who placed in mother's mind the thought that Ms. Whitaker is a racist and could be harmful to the minor child. As this court's concern is solely the best interests of the minor child, and not the parties right to have whoever he or she wants in their house whenever he or she wants to have them, this court shall impose restrictions regarding Ms. Whitaker, when father has the minor child, Ms. Whitaker shall not be permitted to be present. We enter the following order:

## ORDER

And now, this October 25, 2010, after trial held, custody of the parties' minor, Fortress M. Arielle Chryst, born May 14, 2008, (hereinafter "minor child"), shall be as follows:

1. The parties shall share legal custody of the minor children.

2. Defendant, Brenda Chryst (hereinafter "mother"), shall have primary physical custody of the minor child.

3. Plaintiff, Thomas E. Chryst (hereinafter "father"), shall have physical custody of the minor child the first three (3) weekends of each month from Thursday at 3:00 p.m. until Sunday at 12:00 noon, and at such other times as the parties may agree.

4. Mother shall have mother's day and father shall have father's day each year from 9:00 a.m. to 7:00 p.m.

5. The parties shall alternate the following holidays from 9:00 a.m. to 7:00 p.m., with mother having the next holiday after the date of this order: Easter, Memorial Day, July 4th, Labor Day, and Thanksgiving.

6. The parties shall alternate Christmas in accordance with the previous arrangement of the parties. If they are unable to agree, the parties shall alternate the Christmas holiday such that in odd-numbered years, mother shall have custody from December 24 at 1:00 p.m. to December 25 at 1:00 p.m., with father having December 25 at 1:00 p.m. to December 26 at 1:00 p.m., with the parties to alternate in even-numbered years.

7. Each party shall be entitled to two (2) weeks of uninterrupted custody time with the minor child for purposes of taking a vacation. The vacationing party shall provide the non-vacationing party with at least sixty (60) days written notice of the dates and times for vacation. If the proposed vacation times conflict, mother's time shall control in odd-numbered years and father's time shall control in even-numbered years.

8. The holiday and vacation times shall take precedence over the regular custody schedule.

9. The parties shall engage in co-parenting counseling, with the counselor to be chosen by agreement of the parties, and in lieu thereof, by the court upon receiving notice. Father shall pay sixty-five percent (65%) of the cost of the counselor with mother to pay thirty-five percent (35%).

10. When father has custody of the minor child, he shall not permit Barbara Whitaker to be present or have

access to the minor child, either directly or through telephone, correspondence, computer or otherwise.

11. The attached Appendix shall be made a part of the within order.

12. This order shall be considered a final order finally resolving the issues raised in father's complaint for custody.

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

1. In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

A. The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

B. The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

C. The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

2. In the event of any serious illness of the child

at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

3.   Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

4.   Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three (3) days.

5.   The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

6.   The parties shall, at all times, consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

7.   Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the

other party. It is harmful to a child to be put in the role of spy.

8. The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

9. Weekend and evening visitation shall be subject to:

A. Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

B. Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

C. If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the ther party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

D. The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

E. If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for

an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

F.    If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

10.  If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.